Hillsborough-southern judicial district
No. 2008-844

SOUTHERN NEW HAMPSHIRE MEDICAL CENTER

v.

ANTHONY HAYES

Argued: October 8, 2009
Opinion Issued: February 11, 2010

*Welts, White & Fontaine, P.C.*, of Nashua (*Michael J. Fontaine* and *Lisa A. Biron* on the brief, and *Mr. Fontaine* orally), for the plaintiff.

*Smith-Weiss, Shepard & Durmer, P.C.*, of Nashua (*Robert M. Shepard* and *Melissa S. Penson* on the brief, and *Ms. Penson* orally), for the defendant.

DUGGAN, J. The defendant, Anthony Hayes, appeals: (1) an order of the Superior Court (*Brennan*, J.) granting summary judgment in favor of the plaintiff, Southern New Hampshire Medical Center (SNHMC), with respect to Karen Hayes' unpaid medical expenses; (2) an order of the Superior Court (*Nicolosi*, J.) granting SNHMC's motion *in limine* to exclude evidence that Karen Hayes "eloped" under the doctrine of necessaries; and (3) a ruling on the merits (*Smukler*, J.) finding Anthony Hayes liable under the doctrine of necessaries for Karen Hayes' medical bills. We affirm in part, reverse in part, and remand.

The record supports the following facts. Anthony and Karen Hayes married in 1977. In July, August, October and November 2006, Karen, who did not have health insurance, received emergency medical treatment at SNHMC for complications stemming from alcoholism, leaving a balance due of $85,238.88. The record contains conflicting evidence about the status of Karen and Anthony's marriage during this time. While Karen's medical records indicate that she was living with Anthony, Anthony disputes this, asserting that he and Karen "did not live as husband and wife for the past seven to eight years . . . when [the medical bills] were . . . incurred." For example, Anthony testified that sometimes Karen was admitted to SNHMC after being "taken out of hotels, motels, and other people's houses."

SNHMC filed suit against the Hayeses, and successfully sought a real estate attachment on two unencumbered parcels owned jointly by the Hayeses. When SNHMC placed an attachment on the properties, Karen and Anthony were still married. The Hayeses were divorced in January 2007 pursuant to a stipulated agreement. Under the terms of the divorce, each party was responsible for his or her own medical expenses not covered by insurance. Specifically, "Karen [was] responsible for paying the debt to [SNHMC] as well as any other medical debts or bills." Karen received one automobile valued at $1,200, her bank account with a balance of $0.00, and all of her debts. Anthony received the marital properties subject to SNHMC's attachment.

Prior to trial, SNHMC moved *in limine* to prohibit Anthony "from introducing at trial any information, documentation or witnesses concern-

ing or in any way referencing an alleged common law doctrine of elopement." SNHMC argued that elopement is an affirmative defense, and that Anthony failed to give adequate notice, pursuant to Superior Court Rule 28, that he intended to rely upon this doctrine. Anthony objected, contending that he gave adequate notice.

The trial court granted SNHMC's motion. It ruled that elopement is an affirmative defense, but that Anthony failed to properly raise it. The court found that it would be unfair to require SNHMC to counter this defense, given that "the legal fact of marriage was not in dispute."

The trial court granted summary judgment in favor of SNHMC against Karen, finding "no issue of material fact" that she was liable for the balance owed to SNHMC. The trial court, however, denied SNHMC's motion for summary judgment against Anthony, finding that genuine issues of material fact remained with respect to his liability for Karen's medical expenses. Following a bench trial on the merits, the trial court found that Anthony was liable, under the doctrine of necessaries, for Karen's medical debts to SNHMC. During the pendency of these proceedings, Karen passed away.

On appeal, Anthony argues that: (1) elopement is not an affirmative defense; (2) even if it is, he provided sufficient notice; (3) pursuant to *Cheshire Medical Center v. Holbrook*, 140 N.H. 187, 190 (1995), SNHMC was required to find that Karen had inadequate funds before seeking reimbursement from Anthony; (4) Karen had sufficient resources to satisfy her debt because Karen jointly owned the two pieces of property attached by SNHMC; and (5) the trial court erred when it granted summary judgment against Karen. SNHMC counters that: (1) elopement is an affirmative defense; (2) Anthony's interrogatory responses and pleadings did not provide adequate notice; (3) even if the trial court erred by treating elopement as an affirmative defense, that error was harmless because Anthony could not factually support an elopement defense; (4) SNHMC was required only to first seek payment from Karen before pursuing Anthony, which it did; (5) Karen lacked sufficient resources to satisfy her debt to SNHMC; (6) the trial court correctly granted summary judgment against Karen and found Anthony liable under the necessaries doctrine; and (7) Anthony lacks standing to contest the trial court's summary judgment ruling against Karen.

## I. Summary Judgment: Karen Hayes

We first address, as a preliminary matter, SNHMC's argument that Anthony lacks standing to appeal the summary judgment against Karen. Specifically, SNHMC contends that only Karen's estate would have standing to appeal and "as of this time, no estate has been opened," and that "Mr.

Hayes has suffered no legal injury that an appeal to this Court will protect and he may not seek relief for the benefit of another." Although Anthony did not address these contentions in his brief, at oral argument he argued that he has standing to challenge the judgment against Karen because, under the necessaries doctrine, he is potentially liable for her debt. We assume for the purposes of this appeal that Anthony has standing to attack the judgment against Karen.

Anthony argues that the trial court erroneously granted summary judgment against Karen. He contends that whether he and Karen were married for the purposes of liability under the necessaries doctrine, and whether SNHMC's charges and the medical services provided to Karen were reasonably necessary, were material, disputed issues of fact. He argues that the trial court erroneously granted summary judgment against Karen because the evidence was insufficient for such a ruling. Anthony also maintains that the affidavit supporting SNHMC's motion for summary judgment was incompetent because the affiant was not a medical practitioner and lacked personal knowledge of the services provided and whether they were medically necessary. SNHMC counters that the applicability of the necessaries doctrine is irrelevant to the validity of the judgment against Karen, Karen's objection did not comply with RSA 491:8-a (1997), and Anthony failed to present any facts supporting his contention that SNHMC's charges and services were unreasonable. SNHMC also argues that Anthony failed to preserve his arguments that its charges were not reasonable because of its billing practices and that its affidavit was incompetent because he first raised those arguments in a motion to reconsider.

"When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and inferences properly drawn from them, in the light most favorable to the non-moving party." *Everitt v. Gen. Elec. Co.*, 159 N.H. 232, 234 (2009). "If this review does not reveal any genuine issues of material fact, *i.e.*, facts that would affect the outcome of the litigation, and if the moving party is entitled to judgment as a matter of law, we will affirm." *Smith v. HCA Health Services of N.H.*, 159 N.H. 158, 160 (2009). "We review the trial court's application of the law to the facts *de novo.*" *Everitt*, 159 N.H. at 234.

In its motion for summary judgment against Karen, SNHMC contended that it provided medical care to her and that, as a result, she owed SNHMC for the services provided. In support of its motion, SNHMC attached an affidavit from its Credit and Collection Manager who stated that she was "familiar with the books and records of [SNHMC]" and had "personal knowledge of the matters stated herein."

In her objection, Karen denied "that medical and health care services and/or supplies were properly administered to [her] or that they were reasonable or necessary." She also asserted:

> In determining whether or not the charges rendered by [SNHMC] in this case are reasonable, the court needs to consider other issues, such as the fact that [SNHMC] is allegedly a non-profit organization and needs to consider billing rates or cash payments as opposed to insurance payments or [Medicaid] payments.

Karen neither referred to anything in the record nor filed an affidavit contradicting SNHMC's motion.

■ We agree that whether the Hayeses were married for the purposes of liability under the necessaries doctrine was irrelevant to the trial court's grant of summary judgment against Karen. Moreover, Karen failed to allege that there were any disputed issues of material fact, or that SNHMC was not entitled to judgment as a matter of law. The party opposing a motion for summary judgment cannot "rest upon mere allegations or denials of [the] pleadings, but [her] response, by affidavits or by reference to depositions, answers to interrogatories, or admissions, must set forth specific facts showing that there is a genuine issue for trial." RSA 491:8-a, IV. Karen failed to refer to any facts in the record, or to present the trial court with an affidavit, supporting her allegations that the hospital's charges were not reasonable.

In her motion to reconsider, Karen raised a new challenge to the affidavit supporting SNHMC's motion for summary judgment:

> [SNHMC] submitted an Affidavit in support of its Motion For Summary Judgment, along with a copy of an invoice for services that were rendered to the Defendant. The Affidavit was signed by an employee that works in the business department of the hospital, and not by a doctor or a medical practitioner.

The motion thus challenged the competency of the affidavit. The motion, however, failed to identify any facts supporting Karen's claim, and failed to demonstrate that SNHMC was not entitled to judgment as a matter of law.

## II. The Doctrine of Necessaries

The ancient common law doctrine of necessaries imposed liability on husbands for "essential goods and services provided to [their wives] by third parties" if they failed to provide their wives "with such necessaries."

*Holbrook*, 140 N.H. at 189 (quotation omitted). Necessaries included "necessary food, drink, washing, physic, instruction, and a suitable place of residence, with such necessary furniture as is suitable to her condition." *Ray v. Adden*, 50 N.H. 82, 83 (1870); *see Morrison v. Holt*, 42 N.H. 478, 480 (1861) (legal expenses not necessaries unless husband's conduct rendered expenses necessary to secure wife's personal protection or safety).

This doctrine originated as a result of draconian legal restrictions on the rights of married women to "contract, sue, or be sued individually" or exercise control over their property or financial affairs. *North Ottawa Community Hosp. v. Kieft*, 578 N.W.2d 267, 269 (Mich. 1998); *Medical Business Associates v. Steiner*, 588 N.Y.S.2d 890, 892 (App. Div. 1992). A married woman's contracts " 'were absolutely void, — not merely voidable, like those of infants and lunatics.' " *Holbrook*, 140 N.H. at 189 (quoting *Dunlap v. Dunlap*, 84 N.H. 352, 353 (1930)). "[U]pon marriage a woman forfeited her legal existence and became the property of her husband," as, in the eyes of the law, a husband and wife were considered one legal entity. *Id.*; *Steiner*, 588 N.Y.S.2d at 892. In return for his responsibility for his wife's support and liability for her torts, a husband was entitled to her "society." *Drew's Appeal*, 57 N.H. 181, 183 (1876).

> "A man has as good a right to his wife, as to the property acquired under a marriage contract; and to divest him of that right without his default, and against his will, would be as flagrant a violation of the principles of justice as the confiscation of his estate."

*Holbrook*, 140 N.H. at 188 (quoting *Drew's Appeal*, 57 N.H. at 183). The husband was "the sole owner of the family wealth," and the wife was "viewed as little more than a chattel in the eyes of the law." *N.C. Baptist Hospitals, Inc. v. Harris*, 354 S.E.2d 471, 474 (N.C. 1987) (quotation omitted).

Accordingly, the law of necessaries "attempted to obviate some of the victimization which coverture would otherwise have permitted" by "providing a common-law mechanism by which the duty of support could be enforced." *Kieft*, 578 N.W.2d at 270 (quotation omitted). It reflected the sad reality that, "[b]ecause the wife could not contract for food, clothing, or medical needs, her husband was obligated to provide her with such necessaries." *Holbrook*, 140 N.H. at 189 (citation and quotation omitted). To obtain compensation from a husband for goods or services provided to his wife, a creditor had to set forth a *prima facie* case that husband and wife were married, that the husband failed to provide his wife with necessaries, and that the articles or services in question were necessaries "according to the husband's situation in life." *Rumney v. Keyes*, 7 N.H. 571, 580 (1835); *see Ott v. Hentall*, 70 N.H. 231, 232 (1899). If the couple separated, the

husband could nonetheless be liable under the necessaries doctrine if he caused the separation by abandoning his wife, evicting her without reason, or committing some other kind of misconduct that drove the wife out of the marital home. *Ott*, 70 N.H. at 232; *Allen, Cummings & Co. v. Aldrich*, 29 N.H. 63, 73 (1854); *Rumney*, 7 N.H. at 578. However, even if the husband and wife separated by consent, a husband could still be liable for his wife's necessaries. *Pidgin v. Cram*, 8 N.H. 350, 351 (1836).

Husbands could avoid liability under the necessaries doctrine under certain circumstances. *See, e.g., Tebbets v. Hapgood*, 34 N.H. 420, 421 (1857); *Allen*, 29 N.H. at 73; *Rumney*, 7 N.H. at 578. For example, a husband whose wife "eloped" would not be liable for her necessaries. *Cogswell v. Tibbetts*, 3 N.H. 41, 42 (1824); *see Rumney*, 7 N.H. at 580. A wife who voluntarily left her husband to live with an adulterer, or was removed forcibly from the marital home but chose to reside with the adulterer, "eloped" for the purposes of the doctrine. *Cogswell*, 3 N.H. at 42. Key to the determination of "elopement" was whether the wife had left her husband, committed adultery and also remained beyond his control. *Id.; see Rumney*, 7 N.H. at 580.

 "In modern America, 'no longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas.'" *Steiner*, 588 N.Y.S.2d at 893 (quoting *Stanton v. Stanton*, 421 U.S. 7, 14-15 (1975)). "The modern marital relationship is viewed by law as a partnership of equality, an evolution from the nineteenth century relationship of dominance by a husband and submission by a wife who had little standing as an individual person or legal entity." *Forsyth Memorial Hosp., Inc. v. Chisholm*, 467 S.E.2d 88, 90 (N.C. 1996). Undoubtedly, married women today have an "unrestricted right to contract," and RSA 546-A:2 (2007) "imposes a gender-neutral obligation of spousal support." *Holbrook*, 140 N.H. at 189. The doctrine of necessaries has been characterized as "an anachronism that no longer fits contemporary society," *Steiner*, 588 N.Y.S.2d at 893 (quotation omitted), and some courts have abolished it. *See, e.g., Emanuel v. McGriff*, 596 So. 2d 578, 580 (Ala. 1992); *Condore v. Prince George's Cty*, 425 A.2d 1011, 1019 (Md. 1981). In New Hampshire, however, the doctrine endures: we extended it to apply to all married individuals, regardless of gender, *see Holbrook*, 140 N.H. at 190, and many courts have similarly extended the doctrine to apply to both husbands and wives. *See, e.g.,* Simons, Note, *Is the Doctrine of Necessaries Necessary in Florida: Should the Legislature Accept the Challenge of Connor v. Southwest Florida Regional Medical Center?*, 50 FLA. L. REV. 933, 939 (1998); *Kieft*, 578 N.W.2d at 270.

■ When considering the application of the doctrine in the modern day, some courts have outlined a *prima facie* case under the law of necessaries as follows:

> In order to establish a *prima facie* case against one spouse for the value of [services or goods] provided to the other spouse, the . . . provider must show that (1) [services or goods] were provided to the receiving spouse, (2) [they] were necessary for the health and well-being of the receiving spouse, (3) the person against whom the action is brought was married to the receiving spouse at the time the [services or goods] were provided, and (4) payment for the necessaries has not been made.

*Wesley Long Nursing Center, Inc. v. Harper*, No. COA06-1706, 2007 WL 4233643, at *2 (N.C. Ct. App. Dec. 4, 2007) (unpublished opinion); *see Queen's Medical Center v. Kagawa*, 967 P.2d 686, 693 (Haw. Ct. App. 1998); *Trident Regional Medical Center v. Evans*, 454 S.E.2d 343, 345 (S.C. Ct. App. 1995). This approach comports with our own common law on the necessaries doctrine. *See, e.g., Ott*, 70 N.H. at 232; *Rumney*, 7 N.H. at 580. We note that, for the purposes of the necessaries doctrine, hospitals and other medical providers are uniquely situated and, therefore, uniquely likely to seek the application of this doctrine, as, unlike other creditors, medical providers may not turn away patients who require treatment. *See Marshfield Clinic v. Discher*, 314 N.W.2d 326, 329 (Wis. 1982) (noting that hospitals are often forced to respond to patients who require immediate, emergency care).

### A. Elopement

■ We next consider whether elopement is an affirmative or general defense to the law of necessaries. As stated above, the trial court ruled that elopement is an affirmative defense, and barred Anthony from presenting evidence that Karen "eloped," finding that Anthony had failed to give adequate notice of his intention to rely upon that defense. We conclude that "elopement" is no longer a defense to the doctrine of necessaries. *Cf. Chisholm*, 467 S.E.2d at 91.

As noted above, the necessaries doctrine developed during a time when married women were severely restricted in their ability to contract, sue, or be sued, or to exercise control over their property, services, or earnings. *See Kieft*, 578 N.W.2d at 269; *Chisholm*, 467 S.E.2d at 90; *Steiner*, 588 N.Y.S.2d at 892. To defend on the grounds of elopement, the non-debtor spouse had to prove that the debtor spouse left the non-debtor spouse, escaped his or her control and committed adultery. *See Cogswell*, 3 N.H. at 42. Such a defense does not comport with the modern status of marriage.

We have "rejected such antiquated and obsolete notions concerning women by modernizing the common law necessaries doctrine to impose liability on a gender-neutral basis and, thereby, making either spouse responsible for the necessary services provided to the other." *Chisholm*, 467 S.E.2d at 90-91; *see Holbrook*, 140 N.H. at 190.

■ Given that the "historical purposes underlying the [elopement] exception to the necessaries doctrine are incompatible with current mores and laws governing modern marital relationships in [New Hampshire]," we find that the elopement exception "has no place in the common law." *Chisholm*, 467 S.E.2d at 91. *But see Bartrom v. Adjustment Bureau, Inc.*, 618 N.E.2d 1, 9-10 (Ind. 1993) (reasoning that common law defenses to application of doctrine of necessaries remain applicable). Rather, we conclude that, under the third prong of the *prima facie* case that we have outlined above, the creditor — in this case, the hospital — must show more than the legal fact of marriage to demonstrate that the parties are "married" for the purposes of liability under the necessaries doctrine. *See Roach v. Mamakos*, 764 N.Y.S.2d 539, 541 (Sup. Ct. 2003); *National Account Systems, Inc. v. Mercado*, 481 A.2d 835, 837 (N.J. Super. Ct. App. Div. 1984). "[P]roof of an undissolved marriage does not in itself provide the basis for liability to a creditor supplying a spouse with necessaries," as "in some circumstances a marriage will cease to [exist] for purposes of liability under" the necessaries doctrine. *Mercado*, 481 A.2d at 837. This is a fact-specific, and case-specific, inquiry. *See Nichol v. Clema*, 195 N.W.2d 233, 235 (Neb. 1972) (noting that each decision with respect to liability under necessaries doctrine "must necessarily be largely governed by the facts existing in the particular case in which it is rendered").

■ The non-debtor spouse's liability under the necessaries doctrine depends on a mutual expectation that the spouses will share assets, expenses, and debts. Accordingly, factors to consider in determining whether the marriage is no longer viable for the purposes of the necessaries doctrine might include whether the parties were separated, when they separated, whether they are living apart, and whether they share their living expenses and debt. *See Mercado*, 481 A.2d at 837 (factors to consider in determining liability under necessaries doctrine include whether the parties are separated and have been financially supporting each other). If a marriage has broken down to the extent that spouses are no longer sharing assets or debts, it makes little sense to hold a non-debtor spouse liable for the medical expenses of the other. *See id.* at 838. *But see Kagawa*, 967 P.2d at 699-700 (non-debtor spouse liable for necessaries until divorce finalized); *Bartrom*, 618 N.E.2d at 9 (holding that "duty of spousal support continues at least until the marriage relationship is dissolved").

For the reasons described above, "elopement" is no longer a defense to the application of the necessaries doctrine; rather, the third party seeking to impose liability on the non-debtor spouse — in this case, SNHMC — retains the burden to demonstrate that the parties were "married" for the purposes of liability under the necessaries doctrine. Because we hold today that "elopement" is not an affirmative defense, we reverse and remand to the trial court for a new trial on the merits.

## B. Liability of Non-Debtor Spouse

We next consider Anthony's argument that SNHMC must determine that his wife could not satisfy her debt before seeking reimbursement from him. Anthony relies primarily upon *Holbrook*, 140 N.H. at 190. SNHMC argues that it must only seek payment from Karen before pursuing Anthony, relying upon language in *Holbrook* which states that "a medical provider must first seek payment from the spouse who received its services before pursuing collection from the other spouse." *Holbrook*, 140 N.H. at 190.

■ Under the doctrine of necessaries, "a husband or wife is not liable for necessary medical expenses incurred by his or her spouse unless the resources of the spouse who received the services are *insufficient* to satisfy the debt." *Holbrook*, 140 N.H. at 187 (emphasis added). Accordingly, "the spouse who receives the necessary goods or services is primarily liable for payment," and "the other spouse is secondarily liable." *Id.* at 188. We have held that the doctrine of necessaries renders the non-debtor spouse "liable to the hospital to the extent [his or her spouse's] estate[] [is] *unable to pay* for the necessary medical services provided." *St. Joseph Hosp. of Nashua v. Rizzo*, 141 N.H. 9, 12 (1996) (emphasis added).

The defendant argued before the trial court that SNHMC was required to demonstrate that Karen could not pay for her medical services before pursuing his assets. The trial court stated that it did "not necessarily agree with . . . Mr. Hayes['] legal position," citing the language in *Holbrook* which states that the medical provider must "first seek payment from the spouse who received its services before pursuing collection from the other spouse." The trial court reasoned that the *Holbrook* "language is directed at collection efforts" and "does not necessarily restrict a finding of liability." However, the trial court, "[f]or the purposes of its analysis . . . accept[ed] [without] deciding the defendant's legal position" and determined that, even under a standard requiring SNHMC to prove that Karen lacks the resources to pay her debts before pursuing Anthony, SNHMC demonstrated that Karen's estate could not satisfy the debt to SNHMC.

We clarify our holding in *Holbrook* by confirming that the trial court applied the correct standard when it determined that Karen could not

satisfy her debt to SNHMC. On remand, the trial court should apply the standard set out above, that the non-debtor spouse is liable for his or her spouse's necessaries if the debtor spouse is unable to pay for his or her necessaries.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS and CONBOY, JJ., concurred; HICKS, J., concurred specially.

HICKS, J., concurring specially. I concur in the judgment of the majority because the issue of abolishing the common law necessaries doctrine was not raised by either party. I write separately, however, because anachronisms in the doctrine, which are evident in the court's discussion of its origins, raise questions about its continued applicability in the modern world.

The necessaries doctrine "originated in English common law over three centuries ago when married women had no property or contractual rights and their husbands controlled their financial affairs. . . . The primary purpose of the doctrine was to assure that dependent wives received support from neglectful husbands." *Medical Center Hosp. of Vt v. Lorrain,* 675 A.2d 1326, 1328 (Vt. 1996).

In *Cheshire Medical Center v. Holbrook,* 140 N.H. 187 (1995), we were called upon to reexamine the necessaries doctrine in light of subsequent changes in the legal status of women. More specifically, *Holbrook* presented the question whether the doctrine, as it then existed in our common law, violated the Equal Protection Clauses of the State and Federal Constitutions. *Holbrook,* 140 N.H. at 188. After chronicling the legal advances that "dissipated the marital disabilities of women," *id.* at 189, we concluded that "[t]he traditional formulation of the necessaries doctrine, predicated on anachronistic assumptions about marital relations and female dependence, does not withstand scrutiny under the compelling interest standard," *id.* at 190. We then "expand[ed] the common law doctrine to apply to all married individuals equally, regardless of gender." *Id.*

Although we purported to "determine whether the [necessaries] doctrine should be abolished or revised," *id.* at 190, we undertook none of the traditional analysis for determining whether to abolish existing precedent. Thus, while the holding in *Holbrook* may appear broad, it bears recalling that the specific question before us was whether the gender distinctions in the common law necessaries doctrine violated constitutional guarantees of equal protection. Thus, *Holbrook's* revision of the doctrine may be viewed as simply the abolition of gender distinctions that violated equal protection,

rather than a considered expansion of the doctrine. An examination of the doctrine under the traditional factors for determining whether to abrogate precedent, however, reveals that it has long outlived its relevance and should be abandoned.

We do not lightly overrule longstanding precedent. *See Alonzi v. Northeast Generation Servs. Co.*, 156 N.H. 656, 659 (2008). "The doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." *Id.* at 659-60 (quotation omitted). Nevertheless, we will abandon precedent when "the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed." *Id.* at 660 (quotation omitted). In determining whether to overrule prior case law, we consider several factors, including:

> (1) whether the rule has proven to be intolerable simply in defying practical workability; (2) whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling; (3) whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; and (4) whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification.

*Id.* (quotation omitted). Most, if not all, of these factors apply to the common law doctrine of necessaries.

The necessaries doctrine arose out of the legal disabilities imposed upon married women under the common law; those restrictions on property ownership and contractual capacity are the raison d'être for the doctrine. As we stated in *Holbrook*, "Because the wife could not contract for food, clothing, or medical needs, her husband was obligated to provide her with such 'necessaries.' " *Holbrook*, 140 N.H. at 189 (citation omitted). Without the underlying legal disability of the wife, the common law justification for binding her husband to her contracts for necessaries disappears. *See Lorrain*, 675 A.2d at 1329 (noting that since women now have the same property and contractual rights as men, "the circumstances that led to the emergence of the necessaries doctrine no longer exist"). Viewed in this light, the doctrine of necessaries is "no more than a remnant of abandoned doctrine" that has been "robbed . . . [of its] justification." *Alonzi*, 156 N.H. at 660 (quotation omitted).

The doctrine also defies practical workability. *See id.* As the Supreme Court of Vermont noted in *Lorrain*, "because the husband's liability under the doctrine had substantial limitations, the doctrine never accomplished its

purported purpose — to be an effective support mechanism for neglected wives." *Lorrain*, 675 A.2d at 1329; *see* Note, *The Unnecessary Doctrine of Necessaries*, 82 MICH. L. REV. 1767, 1799 (1984) (concluding that the necessaries doctrine "is generally an ineffective means of providing spousal support" and finding "no persuasive evidence that the doctrine is useful in the context of the narrow support problem it was intended to alleviate").

Finally, there appears to be little reliance upon the doctrine "that would lend a special hardship to the consequences of overruling" it. *Alonzi*, 156 N.H. at 660 (quotation omitted). In fact, "studies indicate that in deciding whether to extend credit, creditors give little weight to a married woman's support rights." *Lorrain*, 675 A.2d at 1329.

Consideration of the foregoing factors leads to the conclusion that the common law doctrine of necessaries is no longer viable. Furthermore, while our gender-neutral revision of the doctrine in *Holbrook* may have alleviated then extant equal protection concerns, it is doubtful that it solved any of the underlying problems with the doctrine or rendered the doctrine more effective in fulfilling its original purpose. There is, in fact, some indication that "the modern[, gender-neutral] doctrine seems to result in *less* available credit for needy spouses." Note, *The Unnecessary Doctrine of Necessaries, supra* at 1780. As the *Lorrain* court noted, "In truth, extension of the doctrine serves creditors' rights, not spousal support rights," *Lorrain*, 675 A.2d at 1329, in stark contradiction to its genesis. For the foregoing reasons, should a case presenting the issue come before us, the necessaries doctrine should be abolished.